UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JUSTIN BUCHANAN, individually, and on behalf of other members of the general public similarly situated,

Plaintiffs,

v.

CWP CALIFORNIA CORP., a Delaware corporation; and DOES 1 through 100, inclusive,

Defendants.

No. 2:26-cv-00244-WBS-CSK

MEMORANDUM AND ORDER RE: MOTIONS TO REMAND AND COMPEL ARBITRATION

----oo0oo----

Plaintiff Justin Buchanan brought this putative wage-and-hour class action in the Stanislaus County Superior Court, alleging violations of various California labor laws.  Defendant CWP California Corp. ("MCW")[1] removed to this court based on jurisdiction under the Class Action Fairness Act ("CAFA").  Now

---

[1]    CWP California Corp. does business as Mister Car Wash and is accordingly abbreviated as "MCW."  (See Docket No. 12 at 6.)

1

before the court are defendants' motion to compel arbitration, which was filed on February 26, 2026 (Docket No. 12), and plaintiff's motion to remand, which was filed on March 2, 2026 (Docket No. 15).  Although defendants' motion to compel arbitration was filed prior to plaintiff's motion to remand, the court addresses plaintiff's motion to remand first, at the urging of the parties.

I.   Motion to Remand

Under the federal removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction may be removed by the defendant ... to the district court of the United States for the district ... where such action is pending."  28 U.S.C. § 1441(a). Under CAFA, federal courts have original jurisdiction over class actions in which the parties are minimally diverse, the proposed class has at least 100 members, and the aggregated amount in controversy exceeds $5,000,000.  28 U.S.C. § 1332(d)(2). Importantly, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."  Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 89 (2014).

Plaintiff disputes only that the $5,000,000 amount in controversy requirement has been satisfied.  (See generally Docket No. 15.)  To that end, "if a defendant wants to pursue a federal forum under CAFA, that defendant in a jurisdictional dispute has the burden to put forward evidence showing that the amount in controversy exceeds $5 million."  Ibarra v. Manheim

2

Invs., Inc., 775 F.3d 1193, 1197 (9th Cir. 2015); see also, e.g., Jauregui v. Roadrunner Transportation Servs., Inc., 28 F.4th 989, 992 (9th Cir. 2022) (the "ultimate question" is "whether [defendant] met its burden of showing the amount in controversy exceeded $5 million").

To determine the amount in controversy, the court must look to the "face of the pleadings," St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938), but may also consider "facts in the removal petition" and "summary-judgment-type evidence relevant to the amount in controversy at the time of removal," Kroske v. U.S. Bank Corp., 432 F.3d 976, 980 (9th Cir. 2005).

The amount in controversy is "not a prospective assessment of defendant's liability." Lewis v. Verizon Commc'ns, Inc., 627 F.3d 395, 400 (9th Cir. 2010). Rather, it is the "amount at stake in the underlying litigation." Gonzales v. CarMax Auto Superstores, LLC, 840 F.3d 644, 648 (9th Cir. 206) (citation modified); see also Lewis, 627 F.3d at 400 (amount in controversy is "simply an estimate of the total amount in dispute"). It may include, among other things, "damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes." Gonzales, 840 F.3d at 648-49.

Critically, here, "when the claimed amount in controversy is challenged[,] 'CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions

3

underlying the defendant's theory of damages exposure.'" Salter v. Quality Carriers, Inc., 974 F.3d 959, 963 (9th Cir. 2020) (quoting Ibarra, 775 F.3d at 1197-98) (emphasis added).

Defendants have provided a declaration from a payroll analyst at MCW, Amanda Datlow, that describes the putative class roster and a "report of the average hours worked across all shifts and the average shifts worked per week by" the putative class roster during the relevant time period.  (Docket Nos. 18 at 11-12; 18-2 (Datlow Decl.).)  Datlow shared these materials with MCW's outside counsel, Peter Hering, who performed the meticulous calculations detailed in his declaration to arrive at an estimated amount in controversy in excess of $5 million.  (Docket No. 18-1 (Hering Decl.) at 2.)

Specifically, Hering conducted a claim-by-claim, hour-by-hour analysis to arrive at the amount in controvery claimed. (See generally Hering Decl.).  Using the reports and data provided by Datlow, Hering determined that there were approximately 944 putative class members for claims brought under California Labor Code Section 203, which has a three-year statute of limitations; the putative class worked approximately 81,000 weeks in total over the relevant time period; there were approximately 798 putative class members for claims brought under California Labor Code Section 226, which has a one-year statute of limitations, who worked a total of 14,522 bi-weekly pay periods during the relevant time period; the average rate of pay for putative class members was $16.22 per hour, including a discount of $1.50; the average rate of pay for terminated

4

employees was $17.41; and the average number of shifts worked per week by putative class members was 4, at an average shift length of 6.5 hours.  (Id. at 2-5; see also Docket No. 18 at 7-8.)

Defendants then specify the violation rates for the various claims at issue:  a 10% violation rate for meal period and rest break violations, and a 100% violation rate for waiting time penalties (Cal. Lab. Code § 203) and wage statement violations (Cal. Lab. Code § 206).  (Docket No. 18 at 8-9.) Combining these violation rates with the estimates provided in the Hering Declaration, defendants arrive at an amount in controversy of $5,667,202.62.  (Id. at 9; 15-20.)  With including defendants' proposed attorneys' fees of $500,000 (less than ten percent of the claimed amount in controversy), the amount in controversy estimate rises to $6,167,202.62.  (Id. at 9.)

Defendants' specified violation rates are reasonable; if anything, they are unnecessarily low.  The Ninth Circuit has stated that, in wage-and-hour putative class actions, "it makes little sense to require a CAFA defendant to introduce evidence of the violation rate—really, the alleged violation rate—because the defendant likely believes that the real rate is zero and thus that the evidence does not exist."  Perez v. Rose Hills Co., 131 F. 4th 804, 808 (9th Cir. 2025) (emphasis in original). Accordingly, "a CAFA defendant can most readily ascertain the violation rate by looking at the plaintiff's complaint."  Id.

Plaintiff's complaint states that defendants have engaged in a "pattern and practice of wage abuse."  (See Docket No. 1-3 at 7.)  Intuitively, the court would think that

5

defendants are entitled to assume a violation rate of 100% if a "pattern and practice" is taken to mean defendants exercise it all the time.  If the term in understood to mean that defendants exercise the practice most of the time, the violation rate would be at least 50%.  Accordingly, defendants' concession of 10% for the meal period and rest break claims seems generously low. (Id.); see Perez, 131 F. 4th at 808; cf. also Avila v. Rue21, Inc., 432 F. Supp. 3d 1175, 1189 (E.D. Cal. 2020) (O'Neill, C.J.) (collecting cases and observing that "violation rates of 25% to 60% can be reasonably assumed as a matter of law based on 'pattern and practice' or 'policy and practice' allegation[s]"). Nevertheless, defendants have selected a conservative violation rate of 10% for plaintiff's meal period and rest break claims, and the court finds that violation rate to be amply supported by the allegations in plaintiff's complaint.  See Perez, 131 F. 4th at 809.

Defendants assume a 100% violation rate for plaintiff's waiting time and wage statement claims.  (Docket No. 18 at 8-9.) Waiting time and wage statement claims are viewed as derivative of other wage-and-hour claims in the sense that "[i]f [d]efendants had a 'pattern and practice' of refusing to grant meal and rest breaks or pay class members for all hours worked, then it is likely that all or nearly all class members experienced wage statement and delay violations."  Marquez v. Southwire Co., LLC, No. ED-cv-21252 JGB SPX, 2021 WL 2042727, at *6 (C.D. Cal. May 21, 2021) (quotations omitted and emphases added).

6

Correspondingly, several courts in this circuit have found that assuming a 100% violation rate for waiting time and wage statement claims is reasonable because a "former employee need only suffer <u>one</u> of the alleged violations at <u>any time</u> during employment to bring a claim for failure to timely page wages upon termination," <u>Wilcox v. Harbor UCLA Med. Ctr. Guild, Inc.</u>, No. 2:23-cv-02802 MCS JC, 2023 WL 5246264, at *4 (C.D. Cal. Aug. 14, 2023) (emphases added), and a claim for failure to provide accurate wage statements, <u>Sanchez v. Abbott Labs.</u>, No. 2:20-cv-01436 TLN AC, 2021 WL 2679057.  <u>See</u> <u>also</u> <u>Jimenez v. Land O'Lakes, Inc.</u>, No. 1:23-cv-00891 JLT SKO, 2025 WL 2992313, at *6 (E.D. Cal. Oct. 24, 2025) (applying <u>Wilcox</u>).

Further, defendants' assumption that the statutory maximum of thirty days of waiting time penalties, <u>see</u> Cal. Lab. Code § 203, applies is warranted, too, because the complaint expressly states that it is seeking that "upto" that maximum in penalties (see Docket No. 1-3 at 16).   <u>See</u> <u>Ortiz v. Sheraton Operating LLC</u>, No. LA cv-24-05104JAK (JPRX), 2024 WL 4625951, at *8 (C.D. Cal. Oct. 30, 2024) (observing that using amount less than thirty-day maximum would be "unreasonable" where complaint sought penalties "upto" that maximum).

Having determined defendants' amount in controversy calculations to be reasonable, and that the amount in controversy has thus been met, the court will accordingly deny plaintiff's motion to remand.  <u>See</u> 28 U.S.C. § 1332(d)(2).

II.  <u>Motion to Compel Arbitration</u>

Defendant moves to compel arbitration of this dispute based upon the arbitration provision in plaintiff's employment contract.  The court could have addressed this motion before plaintiff's motion to remand, but the parties insisted the court consider and rule upon plaintiff's motion first.  Thus, now that the parties and the court have expended the time and resources necessary to determine whether the case was properly removed to this court, the court now must expend the time and resources to determine whether it should have been filed in any court in the first place.

A.   Plaintiff's Employment and the Arbitration Agreement

Plaintiff was employed at MCW as a Guest Services Specialist from February 2024 to July 2025, when MCW terminated his employment.  (Docket No. 13 at 2.)  MCW utilizes a "human capital management platform" called Dayforce to facilitate employee onboarding.  (Id.)  As part of his onboarding process, Buchanan was required to review and sign a six-page document titled "Mandatory Mutual Arbitration Agreement" (the "Agreement").  (Id. at 4, 5.)

At the very top of the Agreement is a box with bolded text that reads as follows:

**This Arbitration Agreement is a contract and covers important issues relating to your rights. It is your sole responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

(Docket No. 13-2 at 1 (bold in original).)

8

The Agreement also includes what is frequently referred to as a delegation clause, which states: "The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or waiver of this Agreement including, but not limited to, any claim that all or any part of this Agreement is void or voidable" (the "Delegation Clause"). (Id. at 2.)

The Agreement further includes a section, the heading for which is bolded and underlined, entitled "**Class and Collective Action Waivers.**" (Id. at 4 (bold and underline in original).) The first sentence of this section provides that both MCW and Buchanan "agree to bring any claim on an individual basis and not on a class and/or collective action basis." (Id.)

When an onboarding employee opens the Agreement using the Dayforce platform, a pop-up box appears that prompts the employee to select a box stating "I accept and acknowledge the company policy above." (Docket Nos. 13 at 4; 13-3.) An employee may take "as much time as needed" to review the Agreement prior to electronically accepting it, and they may also print it to assist with their review. (Docket No. 13 at 4.)

MCW's records reflect that plaintiff accessed the Agreement and checked the acceptance box on February 27, 2024. (See id. at 5; Docket Nos. 13-4, 13-5.) Plaintiff does not dispute this version of events. Rather, plaintiff challenges various provisions of the Agreement as unconscionable and correspondingly unenforceable. (See generally Docket No. 17.)

9

B.    <u>Enforceability of the Agreement</u>

Plaintiff first argues that the Delegation Clause is unenforceable.  (See <u>id.</u> at 9-16.)  "When determining whether claims are subject to arbitration, courts typically decide two gateway questions of arbitrability: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute."  <u>Diaz v. T-Mobile USA, Inc.</u>, No. 2:25-cv-02933 WBS CSK, 2026 WL 495233, at *2 (E.D. Cal. Feb. 23, 2026) (quotations omitted).  However, these threshold issues "can be delegated to the arbitrator where the parties have 'clearly and unmistakably' manifested such intent'" through a delegation clause.  <u>Gomez v. T-Mobile USA, Inc.</u>, No. 2:24-cv-01468 BJR, 2025 WL 3684175, at *2 (W.D. Wash. Feb. 19, 2025) (citing <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986)); <u>see also,</u> e.g., <u>Kohler v. Whaleco, Inc.</u>, 757 F. Supp. 3d 1112, 1123 (S.D. Cal. 2024) ("[T]he Court considers, as a threshold matter, whether there is clear and unmistakable evidence the parties intended to delegate the arbitrability question to an arbitrator.").

As described above, the Agreement contains a delegation clause stating that the arbitrator – and only the arbitrator – has the authority to "resolve any dispute relating to the interpretation, applicability, enforceability, or waiver" of the Agreement.  (Docket No. 13-2 at 2.)  Courts within this circuit, including this court, have "repeatedly . . . recognized" the exact language in the Delegation Clause as "clear and

unmistakable evidence that the [p]arties intended to delegate." Diaz, 2026 WL 495233, at *2 (collecting cases).

Having now determined that the Agreement includes a delegation clause, the court must "resolve any challenge that an agreement to arbitrate was never formed" as well as "any challenge directed specifically to the enforceability of the delegation clause." Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1030 (9th Cir. 2022). As plaintiff does not challenge that an agreement to arbitrate was formed (see Docket No. 17), the court turns to the latter inquiry.

C.    Enforceability of the Delegation Clause

"A party may challenge a delegation provision using generally applicable contract defenses, including unconscionability." Taylor v. TA Operating, No. 2:22-cv-0094 WBS DMC, 2023 WL 171359, at *9 (E.D. Cal. Jan. 12, 2023) (internal citations and quotation marks omitted). "Unconscionability has both a 'procedural' and a 'substantive' element." Id. at *3 (citing Armendariz v. Found. Health Psychcare Servs., 24 Cal. 4th 83, 114 (2000)).[2] Both of these elements must be "present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." Id.

"A substantive unconscionability analysis examines the fairness of a contract's terms," and correspondingly involves assessing whether there are "terms that are unreasonably

---

[2]    The parties agree that California law governs. (See Docket Nos. 17, 19.)

11

favorable to the more powerful party." Id. (internal citations and quotation marks omitted). While a party may "cite[] provisions outside of the delegation clause in making an unconscionability challenge" to that clause, "it must explain how those provisions make the fact of an arbitrator deciding arbitrability unconscionable." Holley-Gallegly v. TA Operating, LLC, 74 F.4th 997, 1002 (9th Cir. 2023) (emphasis in original).

Plaintiff argues that the Delegation Clause is substantively unconscionable due to a "lack of mutuality" present in another section of the Agreement: in his telling, the Agreement, which the Delegation Clause is "indelibly part of," "allows extremely broad swaths of third-party beneficiaries to require Plaintiff to arbitrate his claims against [defendants], but is devoid of any reciprocal language allowing Plaintiff to compel such third-party beneficiaries to arbitrate any claims Plaintiff may have against them." (Docket No. 17 at 14-15.)

This argument is unavailing. The Agreement clarifies that it applies equally to "any dispute" that defendants and their beneficiaries "may have against" plaintiff (see Docket No. 13-2 at 1), which counters plaintiff's claim that the Agreement somehow lacks mutuality.

Moreover, it is not at all clear from plaintiff's papers how the Agremeent's separate provision regarding third-party beneficiaries pertains to the Delegation Clause, much less how it "make[s] the fact of an arbitrator deciding arbitrability unconscionable." Holley-Gallegly, 74 F. 4th at 1002 (emphasis in original). Also, the sole case plaintiff cites to support his

12

argument regarding a lack of mutuality, Cook v. Univ. of S. California, 102 Cal. App. 5th 312 (2024) (see Docket No. 17 at 14-15), is readily distinguishable because, unlike here, the agreement found to be unconscionable in Cook provided that the plaintiff there would be required to arbitrate even those claims that did not arise out of her employment with the defendants and their beneficiaries.  See 102 Cal. App. 5th at 321, 327.  That lack of mutuality is not present here, where the Agreement is expressly limited in scope to only those claims that arise out of plaintiff's employment with defendants.  (See Docket No. 13-2 at 1); see also Connell v. ByteDance, Inc., No. 24-cv-07859 NC, 2025 WL 1828472, at *15 (N.D. Cal. July 1, 2025) (observing the same).

There being no other grounds for finding substantive unconscionability, the court concludes that the Delegation Clause is not substantively unconscionable.  Accordingly, the Delegation Clause is not unconscionable.   See Taylor, 2023 WL 171359, at *9 (unconscionability requires both procedural and substantive unconscionability).

D.    Dismissal of Class Claims

Defendants also request the court to strike plaintiff's class action allegations pursuant to the Agreement's class action waiver.  (See Docket Nos. 12 at 13-14; 13-2 at 4 (Agreement's class action waiver provision).)

The Supreme Court has held that class action waivers in arbitration agreements are enforceable.  See Epic Sys. Corp. v. Lewis, 584 U.S. 487, 502-03 (2018).  "Correspondingly, such waivers are routinely upheld by courts in this circuit,"

13

including this court.  Diaz, 2026 WL 495233, at *5 (collecting cases).  The court will accordingly enforce the Agreement's class action waiver here.

IT IS THEREFORE ORDERED that plaintiffs' motion to remand (Docket No. 15) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that defendants' motion to compel arbitration (Docket No. 12) be, and the same hereby is, GRANTED. This action is hereby STAYED pending arbitration.

The Clerk shall close this file administratively, subject to it being reopened upon the application of either party after arbitration has been fully completed.

Dated:  April 30, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

14